# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:05CV150-H

| | |
|---|---|
| **JERRY D. RANKIN,** ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **MEMORANDUM AND ORDER** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social** ) | |
| **Security Administration,** ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #7) and "Brief Supporting ..." (document #8), both filed September 2, 2005; and Defendant's "Motion For Summary Judgment" (document #9) and "Memorandum in Support of the Commissioner's Decision" (document #10), both filed November 1, 2005. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security benefits is supported by substantial evidence. Accordingly, the undersigned will <u>deny</u> Plaintiff's Motion for Summary Judgment; <u>grant</u> Defendant's Motion for Summary Judgment; and <u>affirm</u> the Commissioner's decision.

## I. PROCEDURAL HISTORY

On April 23, 2002, the Plaintiff filed an application for Social Security Disability benefits ("DIB") and Supplemental Security Income ("SSI"), alleging he was unable to work as of March 15,

2001, due to "chronic lower back pain, swelling in ankles and legs [and] asthma." (Tr. 57.) The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing, which was held on March 31, 2004. On April 15, 2004, the ALJ issued a decision denying the Plaintiff's claim. The Plaintiff subsequently filed a timely Request for Review of Hearing Decision. On March 7, 2005, the Appeals Council denied the Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on April 8, 2005, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

The Plaintiff testified that he was born on March 9, 1971, and was 33 years-old at the time of the hearing; that he was 6' 0" tall and weighed 505 pounds; that he was separated from his wife and lived with his sons, ages twelve and four; that he had completed the 10th grade and could read and write; that he had a driver's license; that he had last worked in March 2001, as an independent contractor, driving a seven-passenger van; that he had also worked as a janitor/maintenance worker at a McDonald's restaurant; and that he had stopped his driving job because of poor circulation in his legs, sleep apnea, and infections in his legs and back.

Regarding his medical and emotional condition, the Plaintiff testified that he suffered sleep apnea, shortness of breathe, back pain, arthritis, and swelling, weakness, and cellulitis in his legs; that his distant vision was blurry in his right eye due to an infection; that he could not sit or stand for prolonged periods of time; that at home, he used an oxygen tank that had been prescribed for his mother; and that he took Lortab for pain.

As to daily activities, the Plaintiff testified that he was able to shower/bathe, shave, and dress himself; that each weekday, he "g[o]t [his] sons up" for school; that his sister, who lived nearby, performed the housework; that he drove to doctor's appointments and to church; that he read and watched "a lot" of television; that he played board games with his children; and that he spoke to his aunt every day on the telephone.

A Vocational Expert ("VE") classified the Plaintiff's prior work experience as light and semi-skilled (van driver) and medium and semi-skilled (janitor).

The ALJ then gave the VE the following hypothetical:

> a Claimant with the same age, education and work background ... [with the ability to perform] jobs at the sedentary level ... that would permit a sit/stand option.... would require no climbing or working around heights or dangerous equipment. ... only occasional bending and no stooping and squatting. Are there any jobs [that the Plaintiff could perform with those restrictions]?

(Tr. 261.)

The VE testified that with these limitations, the Plaintiff could work as a cashier II, dispatcher, and telephone order clerk, and that 28,700 of these jobs were available in North Carolina.

The record also contains a number of representations by Plaintiff as contained in his various applications in support of his claim. On a Disability Report, dated May 15, 2002, Plaintiff stated that he was unable to work because of "chronic lower back pain, swelling in ankles and legs [and] asthma." (Tr. 57.) The Agency interviewer who took the report telephonically noted that the Plaintiff had no difficulty hearing, reading, breathing, understanding, thinking coherently, concentrating, talking, or answering.

A June 19, 2002 Report of Contact reflects that Plaintiff stated that when he became short of breath, he would use his mother's oxygen tank and nebulizer.

On a Reconsideration Disability Report, dated July 25, 2002, Plaintiff stated that his condition was unchanged; that he had difficulty standing; and that his doctor had told him to stay off his feet.

On an undated Claimant's Statement When Request for Hearing is Filed and the Issue is Disability, the Plaintiff stated that his condition was unchanged.

On June 19, 2002, an Agency medical expert completed a Physical Residual Functional Capacity Assessment, noting that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that he could sit, stand, and/or walk 6 hours in an 8-hour workday; that his ability to push and/or pull was unlimited; that he should avoid more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling; that he had limited visual acuity; and that with these nonexertional limitations, the Plaintiff had the residual functional capacity for light work. The Agency expert noted that at a June 11, 2002 examination, the Plaintiff was able to ambulate with minimum difficulty; that he had clear pulmonary function with no wheezing or labored breathing; that Plaintiff's strength was "5/5," that is, normal; that Plaintiff had limited hip and back movement due to his "girth"; and that Plaintiff's shoulder, arms, ankles and feet were "grossly normal."

On September 13, 2002, William Robie, M.D., an Agency medical expert, reviewed and affirmed the earlier Physical Residual Functional Capacity Assessment.

The parties have not assigned error to the ALJ's recitation of the medical records (presented to the ALJ at or after the hearing). Moreover, the undersigned has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

The medical evidence also shows that the claimant has a history of asthma that has

been treated with beta agonist therapy and home oxygen therapy; that he experiences wheezing and coughs at night (Exhibit 10F, page 3); and that he was being maintained on the prescribed oxygen therapy without any repeated episodic flares at any time relevant to this decision. When the claimant underwent a consultative evaluation in June 2002, imaging of his chest demonstrated no significant abnormality. There was no significant evidence of the claimant's having to seek ongoing treatment by a physician for his asthma or that his asthmatic attacks varied in severity at any time relevant to this decision. While he experienced shortness of breath, wheezing and coughing, he did not suffer any severe attacks that caused increased breathing difficulty, sweating, rapid heart beats, or severe respiratory distress for more than brief periods of time. For the most part, the claimant's asthma was treated with inhalers, drugs and the administration of oxygen at home. The medical evidence shows that in July 2003, he experienced difficulty breathing and shortness of breath that was moderate and exacerbated by coughing. The claimant also experienced an exacerbation of his asthma in November 2003 (Exhibit 11F, pages 19 and 20). Upon examinations in November 2003 and in February 2004, the claimant was complaining of a shore throat (Exhibit 11F, pages 8, 10, 24 and 26).

The medical evidence also reflects the claimant's complaints of a history of chronic low back pain that was treated conservatively with medications and physical therapy with some resolution of the pain and spasms. When the claimant underwent a consultative evaluation that was completed by Dr. Carl T. Augustus in June 2002, Dr. Augustus noted that the claimant was morbidly obese, and had normal posture and a normal gait as well as a mild ptosis of the right eye; and that he was able to get on and off of the examination table unassisted. He also indicated that the claimant had decreased flexion, extension and rotation of the thoracolumbar spine as well as his knees, and that he also had a restricted range of motion of the hips due to his girth. The claimant's cervical spine, shoulders and upper extremities, ankles and feet were within normal limits. Objective findings also revealed that the claimant has a negative straight leg raising, bilaterally. Imaging of the spine was not performed due to the claimant's habits. Dr. Augustus noted that the claimant's functional limitations were related primarily to his morbid obesity and not his back pain (Exhibit 10F, pages 307). Additionally, the medical evidence shows that the claimant sought treatment for abdominal gas pain and blood in his stool, constipation and hemorrhoids and assessed with ventral hernia (Exhibit 8F, page 3) (Exhibit 9F). I also note that the claimant was assessed with non-insulin dependent diabetes mellitus when he was examined in January 2003 (Exhibit 11F, pages 5 and 6)....

No treating or examining physician has indicated findings, which would satisfy the severity requirements of any listed impairment...

The medical evidence further demonstrates that the claimant experienced elevated blood pressure, significant swelling in his lower extremities, and cellulitis with an

abscess of the legs. His secondary diagnoses were for morbid obesity and sleep apnea. Around the time of the alleged disability onset date, the claimant was suffering from pain and swelling in his leg that affected his walking. In April 2001, the claimant was hospitalized due to his being febrile and complaining of left leg swelling and erythematosus as well as difficulty ambulating (Exhibit 3F, pages 2-3). He underwent a venous Doppler study sonography of the left lower extremity that was negative for deep venous thrombosis. The following month, the claimant was hospitalized and treated intravenously for a high fever accompanied by other lower extremity symptoms. He underwent defervescence with resolution of his leukotosis. His edema, erythema and induration significantly improved in his left calf during the five-day stay. The claimant was assessed with left lower extremity cellulitis, i.e., diffuse, edematous inflammation of the deep subcutaneous tissues and muscles, and chronic lower extremity swelling, secondary to sleep apnea, hypertension and obesity. His pain, swelling and erythema of the left lower extremity and hypertension were what largely contributed to his obesity and obstructive sleep apnea. His elevated blood pressure level was well controlled with the prescribed diuretics and anti-hypertensive medications (Exhibit 4F, pages 1-2). While the claimant did well after being hospitalized from May 16-20, he was again hospitalized for cellulitis of his lower extremity on June 30, 2001, after complaining of pain, swelling in his left leg and thigh. His hypertension was also elevated at that time. An ultrasound was negative for deep venous thrombosis of the bilateral lower extremities. The claimant was given appropriate medications and dietary instructions and encouraged to use his continuous positive airway pressure (CPAP) at night and to elevate his lower extremities. The claimant was given appropriate medications and dietary instructions and encouraged to use his continuous positive airway pressure (CPAP) at night and to elevate his lower extremity until the cellulitis resolved (Exhibit 6F, pages 1, 2, 6, 8, 9 and 17).

By September 2001, the claimant had realized some improvement. When he sought emergency care and treatment, he was only complaining of left lower extremity redness and pain, but no swelling (Exhibit 7F, pages 2 and 4). The claimant again sought treatment in April 2002 and was assessed with hypertension and venous stasis and encouraged to use the prescribed therapeutic stockings, elevate legs and lose weight. When the claimant was examined in June 2002, he had ongoing lower extremity swelling and some difficulty with pain and discomfort. He also had some concerns about his heart. He had edema in left extremity up to his knees and was again advised to use his stocking, lose weight and elevate his legs (Exhibit 8F, pages 3 and 6).

When the claimant underwent a consultative evaluation that was completed by Dr. Augustus in June 2002, Dr. Augustus noted that the claimant's peripheral pulses were diminished in the bilateral pedal areas; that he had significant joint erythema, muscle atrophy or asymmetry or obvious deformity. He also noted that functionally, the

claimant's limitations seemed to be related to his morbid obesity and were exacerbated by his poorly controlled significant lower extremity edema, and that he was not able to perform heel to toe walking, tandem walking or squat and rise (Exhibit 10F, pages 3-7).

In July 2003, the claimant presented with a complaint of left lower extremity swelling, but a repeat ultrasound was without any evidence of deep venous thrombosis (Exhibit 11F, pages 26, 31 and 36). With the appropriate therapy, the claimant realized some resolution of the clinical manifestations of his cellulitic inflammation and lesion.

The medical reports further reflect that the claimant's hypertension was monitored and treated with anti-hypertensive medication at all times relevant to this decision; and that his blood pressure levels have varied and were exacerbated by his excessive wight and sleep apnea. However, the medical evidence fails to demonstrate that the claimant has suffered significant complications related to untreated hypertension, or significant involvement with organs other than peripheral edema that was a significant problem for a period of time less than 12 consecutive months. With proper treatment, the claimant's edema resolved even though he continued to be treated and monitored for elevated hypertension (Exhibit 11F, pages 5 and 6).

Additionally, the medical evidence shows that the claimant has a history of daytime sleepiness that is associated to his episodic nocturnal breathing and restless secondary to his sleep apnea. While hospitalized in April 2001, the claimant admitted that he had a lot of problems due to discontinuing using the continuous positive airway pressure (CPAP) device because he could not tolerate it (Exhibit 2F, pages 1, 3 and 6. The claimant was given appropriate medications and dietary instructions and encouraged to use this CPAP mask at night and to elevate his lower extremities until the cellulitis resolved (Exhibit 6F, pages 1, 2, 6, 8, 9 and 17). While the claimant alleged excessive daytime sleeping, he did not establish that the sleepiness disrupts his daily activities or that he suffers any serious difficulty with concentration or memory deficits. The evidence is persuasive that the claimant's elevated hypertension, obesity and sleep apneas are related.

The medical evidence documents the claimant's weight as 495 pounds for his height of 6'0" as of June 2001 (Exhibit 6F, page 2). The claimant testified that he weighs 505 pounds for his height of six feet. Physical examinations, and laboratory studies and tests were often limited due to the claimant's obesity and girth (Exhibits 8F, page 7) (Exhibit 10F, page 5). In June 2002, the claimant was referred to a bariatrics clinic for management of his excessive weight. The medical reports documents the claimant's weight as of alleged disability onset date as being morbidly excessive with a hundred pound weight gain within a year (Exhibit 3F, page 2). The medical evidence records a referral for related nutritional and hormonal evaluations, (Exhibit

3F, page 4) but there were no medical notes of such consultations. While there is also evidence of problems associated with the claimant's excessive weight, there are no records of any attempts of the claimant to control his weight. Nor does the medical evidence reflect that he was placed on a dietary regimen, an exercise program, or a behavior modification program; that he was treated with medications for obesity by any of his attending and treating physicians; or that he underwent operative therapy for obesity. Since there is evidence that the claimant suffered from metabolic and structural disorders that are normally associated with obesity, the effects of obesity on his musculoskeletal, respiratory, and hypertensive impairments were determined to be significant.

(Tr. 19-23.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that the Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision; that the Plaintiff suffered sleep apnea, hypertension, degenerative joint disease of the left knee, and obesity, which were severe impairments within the meaning of the

---

[1]Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:
inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .
Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that the Plaintiff was a "younger individual" with a "limited education"; that the Plaintiff had the residual functional capacity for a "wide range of sedentary work"[2] with a sit/stand option, and requiring no more than occasional bending, and no stooping, squatting, or working at heights or around dangerous machinery; and that Plaintiff was unable to perform his past relevant work.

The ALJ then correctly shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on a hypothetical that factored in the limitations discussed above, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform, and, therefore, that the Plaintiff was <u>not</u> disabled.

On appeal, the Plaintiff contends that his residual functional capacity should have included additional nonexertional limitations based on his asthma and alleged vision problems, implying that the ALJ erred in not finding him disabled based on these conditions. <u>See</u> Plaintiff's "Motion for Summary Judgment" (document #7) and "Brief Supporting ..." (document #8). However, the undersigned finds that there is substantial evidence supporting the ALJ's finding concerning the Plaintiff's residual functional capacity, and his ultimate determination that the Plaintiff was <u>not</u> disabled.

The Social Security Regulations define "residual functional capacity" as "what [a claimant]

---

[2]Sedentary work involves lifting no more than 10 pounds at one time and occasionally lifting and carrying items such as docket files, ledgers, and small tools. <u>See</u> 20 C.F.R. § 416.967(a); SSR 83-10. Sedentary work is performed primarily in a seated position, but occasional walking and standing is often required. 20 C.F.R. § 416.967(a); SSR 83-10. "Occasionally" means from very little up to 2 hours out of an 8-hour work day. SSR 83-10.

10

can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited his ability to work. Agency medical experts determined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that he could sit, stand, and/or walk 6 hours in an 8-hour workday; that his ability to push and/or pull was unlimited; that he should avoid more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling; that he had limited visual acuity; and that with these nonexertional limitations, the Plaintiff had the residual functional capacity for light work.

The ALJ found the Plaintiff not disabled, however, based on his ability to perform <u>sedentary</u> work, with a sit/stand option, and requiring no more than occasional bending, and no stooping, squatting, or working at heights or around dangerous machinery. As the Defendant points out in her brief, the limitation to sedentary work adequately accounted for the Plaintiff's alleged asthma. <u>See</u> SSR 83-14 ("the overwhelming majority of sedentary jobs are performed indoors"); SSR 85-15 ("most job environments do not involve great noise, amounts of dust, etc."); SSR 96-9p (few unskilled sedentary jobs require exposure to temperature or humidity extremes or unusual hazards); and United States Department of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* 97, 331, 333, 337, 341 (1993).

Moreover, the undersigned notes that none of the Plaintiff's treating physicians ever opined that he was unable to work. Indeed, rather than proving the existence of a disability, the undisputed

medical record, recited above, clearly supports the ALJ's essential conclusion: that Plaintiff suffered from – but was not disabled by – sleep apnea, hypertension, degenerative joint disease of the left knee, and obesity. The Plaintiff's high blood pressure was controlled by medication, and there is no evidence that he made any attempt to control his weight, which his doctors concluded was clearly a factor concerning his other severe impairments: sleep apnea and bone and joint pain. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

Concerning the Plaintiff's contention that the ALJ should have found him disabled based upon his asthma, the record shows that Dr. Dean described Plaintiff's asthma as only "periodic" (Tr. 103) and "stable" (Tr. 105), and Plaintiff reported to Dr. Augustus that his asthma bothered him mainly at night when reclined or when exposed to extremes of heat and cold, rather than throughout the day on an ongoing basis. The Plaintiff's lungs were generally clear on repeated examinations. (Tr. 92, 95, 104, 110, 125, 163-165, 167, 210, 212, and 214.) Chest x-rays demonstrated no significant abnormality. (Tr. 110 and 160.) At the time of a mild exacerbation in May 2001, Plaintiff was treated successfully with oxygen and Albuterol. At the June 2002 consultative exam, Plaintiff reported past emergency room visits for asthma, but denied any history of intubation and reported that he did not regularly check his asthma with a Peak Flow Meter. In fact, the record reveals just one emergency room visit for asthma, in November 2003, which was characterized as an exacerbation of "moderate" asthma and after which Plaintiff was released in improved condition.

The ALJ noted that there had been no asthma flare-ups at any time relevant to his decision. Moreover, no medical source placed any specific limitations on Plaintiff relative to his asthma. "The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). Accordingly, substantial evidence supports the ALJ's finding that Plaintiff's asthma was not disabling.

Similarly, there was substantial evidence supporting the ALJ's conclusion that the Plaintiff's alleged vision problems, which were supported in the record by a single notation of mild ptosis[3] of the right eye at the consultative exam with Dr. Augustus, were non-severe and, therefore, not disabling. None of Plaintiff's physicians ever mentioned ptosis in their treatment notes, either before or after Dr. Augustus' consultative exam. The medical treatment records contain just one complaint of blurred vision, on June 30, 2003, apparently attributed to hypertension at that time, and the Plaintiffs eyes were normal on exam at that time. Otherwise, Dr. Ryan commented that his exam of Plaintiff's eyes was unremarkable for any conjunctival infection, and other treatment providers consistently reported normal findings relative to Plaintiff's eyes. (Tr. 124, 144, 148, 163-165, and 167-168.) Most recently, Plaintiff repeatedly denied having any blurred vision, pain, or other eye problems to Physician's Assistant Lydia Battle, and she reported normal eye exams. (Tr. 210, 212, and 214.)

The Plaintiff reported and/or testified that he was able to watch television, read, play board games and drive, activities which were inconsistent with Plaintiff's argument that he has a disabling visual impairment. Furthermore, Plaintiff never alleged any visual impairment in any of his various disability reports to the Commissioner. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001)

---

[3] Ptosis is drooping of the upper eyelid. Dorland's Illustrated Medical Dictionary 1490 (29th ed. 2000).

13

(failure to allege impairment in a disability application supported ALJ's finding that the impairment caused no significant functional limitations). Finally, the Plaintiff stated in those same reports that he was able to read sufficiently to obtain a driver's license, to complete work reports, and to drive in his past work, and even accepting Plaintiff's testimony as to his having difficulty seeing at a distance, none of the jobs identified by the VE require far visual acuity. See *Selected Characteristics of Occupations* at 97, 331, 333, 337, 341.

In addition to activities that refuted his alleged inability to see well enough to work, the record also establishes that the Plaintiff generally engaged in significant daily life activities, such as bathing and dressing himself, living alone with and caring for his two sons, driving, and going to church. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work" which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by nonexertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and

persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's sleep apnea, hypertension, degenerative joint disease of the left knee, and obesity– which could be expected to produce some of the pain claimed by Plaintiff–and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of [his] pain, and the extent to which it affects [his] ability to work," and found Plaintiff's subjective description of his limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and his objective ability to carry on a moderate level of daily activities, that is, Plaintiff's ability to take care of his personal needs, to live with and care for his sons, and to drive and go to church, as well as the objective

evidence in the medical record, discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by his combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. "Plaintiff's Motion For Summary Judgment" (document #7) is **DENIED**; Defendant's "Motion for Summary Judgment" (document #9) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

**Signed: November 2, 2005**

*Carl Horn, III*
_____

Carl Horn, III
United States Magistrate Judge